

### HODGES WALSH & BURKE, LLP
ATTORNEYS AT LAW
55 CHURCH STREET, SUITE 211
WHITE PLAINS, NEW YORK 10601
———
(914) 385-6000
FAX (914) 385-6060
www.hwb-lawfirm.com

Honorable Kenneth M. Karas
United States District Court
300 Quarropas St.                                    *By ECF*
White Plains, New York 10601

Re: *United States v. James Spina*  18 CR 625 (KMK)

Dear Judge Karas,

This letter brief is being submitted on behalf of James Spina who's sentencing hearing is scheduled on October 29, 2020. This letter brief is in further support of James Spina's sentencing memorandum submitted to the Court on March 31, 2020 and in response to the Government's Sentencing Memorandum submitted on May 4, 2020. For the reasons set forth in his March 31, 2020 memorandum and below it is respectfully submitted that a sentence of 18 to 24 months is sufficient but not greater than necessary.

During his plea allocution, Dr. James Spina accepted responsibility and pleaded guilty to Health Care Fraud under Count I of the indictment. He allocuted that that he did knowingly agree with others to participate with medical corporations that billed medical insurance companies for services rendered. These corporations falsely appeared to be owned by a medical doctor, but were in fact controlled by him and his brother, in which [he and and his brother] exercised control Claims

were submitted to healthcare insurance companies to obtain payments and he and his brother financially benefited from which they were not entitled to under New York State Law.

In the government's sentencing submission and in the presentence report the government grossly overstates its theory that "everything about the 'practice'1 from its corporate structure to its billing practices was fraudulent." (Gvt. Mem. p. 2) The government further grossly overstates in a conclusory manner that James Spina and others "engaged in numerous fraudulent practices such as (1) billing for unnecessary medical procedures; (2) billing for medical services that were never actually provided; (3) double billing, i.e., billing medical services for the same medical services or procedures; and (4) altering or falsifying medical records." (Govt. Mem. p. 2) However, in reality, the 29 licensed practitioners determined what treatment was medically necessary, did not bill for services not provided or double bill for the same medical procedures. Of the 29 licensed professionals, except for the Spinas and Dr. Bagley, none have been charged criminally with any claims of fraudulent practices and are continuing to practice in the medical field.

What is also clear, is that there were thousands of patients who were treated by these independent licensed practitioners through a course of conservative care of physical medicine at Dolson Avenue Medical for injuries that they suffered as a result of a work place injury, motor vehicle accident or other injuries/ailments. These 29 licensed professionals determined the course of treatment and what was medically necessary for the patient to attempt to treat the patient in order to get better and return to work or return to their/more normal physical activities. The licensed

---

1 In the presentence report it the government defines the practice as …. that is incorrect and is an attempt by the government to conflate these different corporate entities into one when they were all individually owned and, for the most part operated by their true owners. See *infra.* pages 8-13.

professionals there was support staff consisting of clerical and administrative staff – each licensed professional had 2 support staff so there were 60 support staff for almost 90 staff in total.

Whether the services were a worker's compensation claim, no fault claim, Medicare or private insurance claim there is a morass of procedures/regulations, requirements for processing these claims for the insured to make sure that the services being charged have been provided. By way of example, for worker's compensation claims, nurse case managers who would appear unannounced at the patients' appointment in the office to confirm the treatment and course of care and that the patients were responding to those treatments. Similarly, there were other checks and balances referenced below put in place by insurance companies and providers to confirm the course of treatment and its medical necessity.

## I.       Services Rendered

These 29 professionals rendered service to approximately 1500-2000 different patients each year. Over the seven-year period in the indictment there was a total of 14,000 patients. Some of the patients were new to the practice and some established patients with new condition or an aggravated condition.  For these patients the licensed professionals rendered approximately 80,000 to 100,000 services to these patients per year. With the number of patients being provided care, certain forms and paperwork were developed for the treating professionals to help streamline patient care, administrative and bill processing.

## A. Course of treatment and Validation by the Insurance Provider of Medical Necessity

More often than not, patients would be referred by outside doctors or surgeons for Physical Therapy or treatment either pre or post-surgery. Ex. I March 31, 2020 submission) The outside doctors would make a determination as to the medical necessity for Physical Therapy and would

provide their patient with a prescription. Physical Therapy cannot not be performed without a prescription from a Doctor.

Another example is a new patient would arrive at Dolson Ave for treatment and there would be an initial consultation and evaluation with a Doctor  2) x rays and 3) possible Chiropractic treatment or Physical Therapy if it was determined to be medically necessary. Whether it was a worker's compensation, no-fault, Medicare, private insurance or patients paying cash they each had its own complex detailed guidelines and procedures for the number of visits and what procedures were or were not covered by their insurance. The fact that the licensed practitioners and support staff were trained or asked to familiarize themselves of what is or isn't covered or how to relay information to the insurance providers is not fraud but good practice and patient care.

Many of treatments provided require pre-authorization by the insurance company before anyone of the professionals at Dolson Ave can provide treatment.  Other validating measures the insurance carriers used to assure medically necessary treatment.  They used Independent Medical Exams performed by insurance company doctors (no-fault patients), peer review, Nurse Case Managers (Workers Compensation Patients) Worker's Compensation hearings (Orders of the Chair) where a Judge approved or denied continued treatment based on medical necessity, No Fault Arbitrations were the Judge determined if treatment provided was warranted,  and MG-2 reports with medical treatment guidelines.

Again, treatment is not randomly done, but instead goes through the proper channels of initial approval and any ongoing approval required every 30 days for continued medically necessary treatment. Certain other procedural measures are in place such as:

- Medical Treatment Guidelines rules states that a re-evaluation is done every 30 days and a Physical Therapy prescription is only good for 30 days – See, https://www.novitas-s olutions.com/webcenter/portal/MedicareJL/pagebyid?contentId=00002879

  (Medicare has the same rules) Limits on number of visits before re-evaluation or further approval from the insurance provider.  If and when a patient's insurance policy had limits (5 visits per year) or no longer approved continued treatment, the patient would pay cash for their visits going forward.

- Independent Medical Examination ("IME") – this is performed by the insurance companies, mostly used by Workers Compensation and No Fault or Auto Accident insurance carriers. Purpose of this is to examine the injured party to make sure patient is getting better and what is the expected date of maximum medical improvement.  This is usually done 2-3 month after the injury and then every 6-8 weeks thereafter to ensure patient is getting proper care and making improvements.  Otherwise the insurance Doctor dismisses the patient from further treatment as they are no longer making improvement and patient has reached maximum medical improvement.  This is also used by NYPD and NYFP injuries and they must see the Police Chief Surgeon every 2 weeks for update on their medical condition.

- Explanation of Benefits (EOB)– shows patients what services they received and what the insurance paid or denied and what the patient is responsible for paying.

- Examination Under Oath (EUO)– this is done by the insurance company and they interview the patient to ensure they are receiving treatment, it is medically necessary and the treatment is provided by the appropriate licensed medical provider. An EUO can also be done on the provider and question the provider on the necessity of services rendered or referrals made on behalf of the patient. Also any corporate or legal issues are brought up at this time.

- Workers Compensation Order of the Chair (OTC) – Insurance Company denies treatment but does not follow the medical treatment guidelines for reason for denial. The Judge review the claim and determines if care and treatment is medically necessary and finds in favor of the claimant or provider or carrier based on medical necessity and the appropriate guidelines

- Electromyleograph (EMG)– diagnostic nerve test for more precise and accurate diagnosis of the patient's condition. It will the specific nerve involvement that should be treated and causing numbness, weakness, tingling and muscle atrophy which is correlated with an MRI and if referred to a neurosurgeon is helpful in determining if patient is a surgical candidate or be referred to an interventional pain management specialist for an injection (epidural or facet)

Common sense dictates that it is unlikely patient would come for an hour of their time and get unnecessary medical treatment and pay a $30.00 or $40.00 co-payment if they had no pain or weren't getting better. Common sense would also tell you that patients would not continue to be out of work for a prolonged period of time receiving a fraction of their normal pay for a worker's compensation claim if they were not in pain and receiving treatment to recover.

## B. Scope of Practices

Each practitioner has their own scope of practice in New York State. 2 For example, under New York scope of practice a Chiropractor treats spinal subluxations (spinal misalignments) they are not allowed under their scope of practice to treat knees or shoulders or wrists or ankles. Therefore, those conditions must be referred out to another doctor or treatment professional. Chiropractors have direct access meaning they do not require a referral or prescription from a medical doctor to receive chiropractic treatment. By comparison, a physical therapist must have a prescription from a physician and their license does allow them to treat knees or shoulders or wrists or ankles. (See, March 31, 2020 Ex. I) Pain management can range from consultation to evaluation, to injections to (Interventional Pain Management) which includes surgery – each Pain Management Doctor practitioner decides their specialty. Based on the patient's history and symptoms, the patient will see the proper practitioner based on their condition for consultation and evaluation. After a consultation and evaluation and any medically necessary diagnostic evaluation (x-rays), a treatment plan would be made by the appropriate treatment provider. Common sense tells you that patients do not come to the office who do not have pains, symptoms or a condition needing treatment. Nor would they endure physical treatment if they were not medically necessary and provide relief.

The government references exhibit numbers 40, 41, 46, 47, 48, 53 ,54, 56 treatment was billed for that not meet the medical necessity criteria. However, none of these exhibits support the government's position.   Ex. 40 states the "MRI Authorization Info" sheet helps speed up authorization process so patient do not wait a month to get their MRI test approved. The first step is to receive a "script" from a doctor.  This check sheet does not show an MRI was not medically

---

2 *See,* New York State Educ. Law Art. 132 §6551 (Chiropractors) §8211 (Acupuncture) and §6731 (Physical Therapy)

necessary because a sheet that was used to gather information to aid in the process of getting a medically necessary test approved for the patient to receive care. In government Exhibit 41 state an MRI may have not been medically necessary for a patient. The check list was sheet was created by the office in 2005 to ensure all points were covered to obtain the authorization for the MRI.  If no authorization is received from the insurance company and patient has the MRI, then the patient would receive a bill. Assuring pre-approval for the patient's procedures is good patient care and does not provide evidence the service was not medically necessary. Patients would not wish to endure to be in an enclosed tube for 45 minute MRI and pay a $50.00 to $100.00 co-payment if they do need a test in order to more accurately diagnose and treat their condition. There is not one patient complaint or insurance carrier stating Dr. Jay Spina or any Doctor at Dolson Avenue ordered an MRI test that the patient did not need.  No patients' names are provided only conclusory statements. Nearly 50% of the patients who came to the office were referred from other physician or surgeons with prescriptions Physical Therapy and/or positive MRI results.  Meaning it was established by another physician that these patients had a condition and that a doctor had it confirmed with either an x ray or MRI ordered by their doctor prior to coming to the DAM office for therapy. Again, this does not support the notion of treatment rendered that was not medically necessary. (See, for example, Ex. I to March 31, 2020 submission) 85% of all these Physical Therapy and Chiropractic services requires pre approval/authorization prior to treating the patient. Over the seven years covered in the indictment there were 650,000 services rendered of which more than 550,000  (85%) of them are Physical Therapy and Chiropractic services which require pre approval prior to being treated.

## II.   Different Corporate Entities of the Practices at Dolson Ave.

As stated in our initial sentencing memorandum, in 2000 Dr. Herbert Garcia engaged counsel to incorporate Dolson Avenue Medical at 54 Dolson Avenue in Middletown NY. His attorney was an established attorney who has devoted his entire law practice to Health Care and Business Law assisting health care professionals in successfully establishing structuring medical practices, managed care agreements and commercial leases.

From 2000 to 2005 Dolson Avenue provided and billed for Medical services, Physical Therapy and Chiropractic services under one tax ID number based on advice of counsel. All of the professional staff were employees of Dr. Garcia including Physical Therapists and chiropractors. Upon the advice of its attorney, Dolson Avenue Medical hired an MSO ("Management Service Organization") which managed the administration and building expenses. This MSO was called Dover Management was established by counsel in 2000 and was owned by Dr Jeff Spina. Dover Management paid all bills and clerical, and administrative staff.

In around 2005 Dr. Garcia was advised by his attorney, to have his own separate and distinct corporation and no longer employ chiropractors. This is when several corporations were created in 2005-2006 other corporations were established in 2011 and 2012. 3

The attorney also advised that Dr. Garcia open his own corporation and each specialty/service do the same as well and have their own Tax ID number. Counsel set up Catskill

---

3 Catskill Medical Care PC d/b/a Middletown Physical Therapy and Pain Management Date of incorporation – March 26, 2000; Middletown Physical Medicine & Rehabilitation P.C.Date of incorporation – April 11, 2006; Middletown Chiropractic d/b/a Chirocare Date of incorporation – January 7, 2006; Middletown Physical Therapy, P.C d/b/a Physical Therapy of Orange County- Date of incorporation – September 28, 2006  by Richard Escano RPT; Physical Medicine and Diagnostic-Date of incorporation –  September 26, 2011; Mid-Hudson Acupuncture, P.C-Date of incorporation – January 9, 2012

Medical in 2005 and Effective Marketing in 2006 (operated by Jay Spina), Middletown Chiropractic in 2006 (operated by Jeff Spina), Physical Medicine & Rehabilitation, PC (operated by Dr. Miriam Kanter).

From 2004 to 2008 Dr. Kanter worked for Dr. Herbert Garcia's firm. From 2008 to present, she worked for her corporation, Middletown Physical Therapy and Pain Management which was also set up by her own attorney.

Middletown Physical Therapy and Pain Management was owned and operated by Dr. Miriam Kanter. Dr. Kanter was interviewed by the FBI on April 9, 2018 and her interview 302 report is attached. (Ex. 1) While at Dolson Avenue Medical ("DAM") Dr. Kantor informed the interviewing agents that "she ran her own practice and maintained her own bank account and was the only signer on the account. (Ex.  1)" She paid her billing employee Emily out of her bank account and spoke to Andrea Grossman about her payroll. *Id.*   Stan (LNU) was her electromyography (EMG) technician and Maureen Lennon completed her transcripts for her corporation. Dr. Kanter had a lease with DAM and paid $2500 a month in rent.4 Dr. Kanter's bank account received money directly deposited in her account from insurance companies and she was the only signor on the account. Dr. Kanter would see her corporate tax returns prepared by and accountant and sign them. Dr. Kanter also stated that she would pay a marketing fee to Jay (Spina's) business.

---

4 Physical Therapist Leah Robles, owner of Physical Therapy of Orange County signed a lease and paid $8000 a month when at 52/54 Dolson and $5000 201 Dolson Ave. Govt. Ex. 75 p. 3) Robles paid her employees Antoinette Blanks, Biller and Benedict Paras, Physical Therapist. Ex. 75 at p. 2)

As to treating patients, Dr. Kanter would review the HP-1s for the patients and all of the patients' prior medical records before treating the patient and would handle her own depositions. Dr. Kanter informed the Agents that she treated 18-25 patients a day.

Dr. Kanter also informed the agents that she paid herself a salary, company expenses and a travel stipend. "She did not take direction on those payments from either Jay or Jeff." Dr. Kanter further informed the agents that "she wrote prescriptions for physical therapy and said that Jay or Jeff could not write prescriptions for physical therapy because they were chiropractors." (Ex. 1).

As to the other corporate entities Physical Therapy of Orange County (owned and operated in 2005 by Richard Escano and later acquired Lea Robles). Six years later in 2012, Dr. Clifton Burt engaged counsel and opened Pain Management & Diagnostics. He too signed a rental agreement and marketing agreement. Similarly, in 2012 Acupuncture of Orange County was established and is owned and operated by RJ Storm. Dolson Avenue Medical remained in operation because Dr. Garcia was an in-network provider for some insurance carriers and could not get Catskill Medical to be an in-network provider. For example, Blue Cross of Ohio, and several other plans were no longer accepting new doctors to their in-network panel.

### III.        Effective Marketing and Marketing Agreements

Upon the advice of counsel, Effective Marketing was created in 2006 and did marketing work for these entities (and other non-related entities). A Marketing agreement was drafted by attorney Peter Birzon and agreed to by Dr. Garcia (Catskill). See Ex. C to March 31, 2020 submission) The other corporate entities also signed market agreements. These agreements were seized by the government during the search. Effective Marketing designed and created all promotion, marketing and advertising including social media, print ads, billboards, and mass

11

mailings. Effective Marketing leased five stationary billboards and three electronic billboards in locations in Middletown, New York. Designed, printed and mailed 300,000 monthly mailings, and newspaper and television ads. (See for example, Ex. D to March 31, 2020) The monthly expenses for marketing was $48,985. (See Ex. E to March 31, 2020)($587,820 per year and approximately $4,114,740 over the seven years for marketing expenses)

Dr. Spina ran the day-to-day operation of Effective Marketing and spent endless hours handling the marketing including all print ads in various newspapers, (3) yellow page books, magazines, social media and website development people and write blogs for website on health-related topics weekly. The marketing agreement included setting up community events, Health & Wellness workshops and lectures and attends these events. As well as meet with representatives from various marketing and promotional agencies to increase the awareness of their services in the community.

From 1995 to 2001 James Spina had a marketing company Meridian consultants in Middletown, NY and then joined Effective Management from 2001 to 2006 in Hackensack, New Jersey prior to moving back to Middletown and starting Effective Marketing in 2006.


## IV.    Rental Agreements

JJM & J Reality Partnership is a reality company formed in 1985 by lawyer/accountant Jeffrey Kaplan in Monticello NY. Over the past three decades JJM&J partnership has leased, subleased and/owned numerous properties. For example, in 1985 JJM&J Partnership purchased Middletown office at 52-54 Dolson Avenue and leased space across the street from Michael Gurda, Esq. Over the next 30 years JJM&J Realty and subsequently Roswell Realty rented office space throughout Orange County including in the City of Middletown, Central Valley, New Paltz and

Montgomery. JJM & J Reality entered into license agreements/ leases drafted by counsel with the different corporate entities. (Ex. F to March 31, 2020 submission) Dr. Kanter, like the other owners of the different corporations signed the leases and paid rent to JJMJ and later Roswell Realty for the space she used while treating her patients as well as the equipment and common charges. (See, Kanter 302 Ex. 1 & fn. 4 Physical Therapy-Robles ) The license/lease agreements were drafted by counsel and the cost of the rent was based on certified appraisals and fair market valuation.  (Ex. G to March 31, 2020). The government makes bald assertions that the leases and marketing agreements were sham leases. They were not. They were drawn up by counsel, review and signed by Doctors or licensed professionals and paid for the space and equipment provided at the 52-54 Dolson and 201 Dolson Ave. The reasonable cost for the price per square foot was contained in the certified appraisals fair market valuation. *Id*. These proper rental payments and marketing fees for space and services provided should be deducted from the fraud loss amount and related forfeiture and restitution.

When Catskill Medical started Dr. Garcia hired staff and handled day-to-day operations of his entities but as the practice grew and the patient numbers increased at DAM/Catskill Medical. Dr. Garcia and his Physician Assistants directed their focus on the patient care and Dr. Garcia delegated various administrative and clerical duties of his corporation to Jay, Jeff and the administrative staff. By exercising the controlling over the finances of Dolson Ave and Catskill, Jay Spina and Jeff Spina ran afoul of the corporate practices of medicine regulations under New York State Education Law § 6521; 8 N.Y.C.R.R. Part 60.

V.      **Billing for Unnecessary Medical Services**

In the government memorandum under the this caption it points to weekly bonus plans or incentives movie tickets and lunch for office staff who reach certain goals in scheduling for Doctors or performing their billing. Nowhere in any of those cited exhibits does it state much less support that the medical services were unnecessary. No individual patient charts are referenced to confirm unnecessary tests, treatment or ordering of durable medical equipment. The MRI section points to a checklist for the staff calling on behalf of a patient to make sure that they have all of the information needed to ensure coverage for a MRI that the Doctor ordered.

As to the Facet injections Dr. Bagley who came to Dolson Avenue Medical in 2016 was the only Doctor performing these procedures. Dr. Bagley was a board certified neurologist with decades of experience of performing injections prior to joining Dolson Avenue Medical. (See, Ex. 2 resume) Dr. Bagley confirmed under oath at his plea allocution that all of the facet injections that he performed were in his professional opinion, medically necessary. (See, Ex. 3 Bagley plea allocution at p. 27 "I felt that the facet injections I did were medically necessary") During his plea allocution the government did not reject or even challenge Dr. Bagley's sworn representations of the medical necessity of the facet injections.

a.  **ELECTORMYOPGRAPHY (EMGs)**

First, Doctors of Chiropractor can perform and order diagnostic nerve tests (EMG's) or MRIs . *See*, Ex. 4 NY State Dept. of Ed. Memorandum-under New York State scope of practice Chirpractors may conduct and order EMGs and  MRIs) Second, as to the EMG's that the doctors performed the doctor would do a consultation and evaluation on patients prior to performing any treatment or diagnostic evaluation – reports were provided showing  medical necessity prior to

doing the any test or treatment confirming patients and reviewing positive MRI results – most often signed off on MRI report stating he reviewed it. Doctors Kanter, Burt and Bagley did consultations and evaluations on patients and made an independently determined their medical necessity prior to performing an EMG. (See, Ex. 5 Bagley evaluations for EMGs) This Medical treatment Guideline applies to all professions or services rendered such as X-rays being performed or Chiropractic treatment, Physical Therapy or any mediation or injection being done – an evaluation is required prior to performing any test or service. Insurance carriers require the a Letter of Medical Necessity from the Doctor before approving or paying for any test – test results without a medical necessity report are routinely denied as not medically necessary if not accompanied by a Letter of Medical Necessity report (MRI, EMG, X rays).

Expert Witness Dr. Evan Gwilliams reviewed numerous EMGs of patients who were treated at DAM and independently determined that based on the patient medical history, MRI results the patients' conditions and failed conservative care an EMG diagnostic testing was and were medically necessary. (Ex. 6)

There was also over 300 EMGs referred to DAM to perform from outside providers Med Focus and One Call Medical whose doctors, along with many other Doctors already determined that these diagnostic tests were medically necessary. Ex. 7)

## VI.   Billing for services never actually rendered

The government references two patients on page 12-13 of its sentencing memorandum. One patient's date of service was November 8, 2016 when they came into office and signed in and went to the Chiropractic treatment area and then went to the bathroom and left without receiving

treatment.  The patient was incorrectly billed by the Chiropractic office and should not have been

billed by Chirocare.  Chirocare is Dr Jeff Spina corporation in which Jay Spina was not involved.

Another patient referenced as "UC-2" in the government's brief came to office for Chiropractic

care and stated "she was unable to run as fast as she used to run." (Govt. memo p. 12) She was

treated and was apparently ~~not~~ happy with her treatment. Her diagnosis was low back pain ICD

Diagnosis code M54.5.  She was upset as she did not complain of low back pain.  Yet of the 72,000

diagnosis codes the doctors' uses the diagnosis code that may have most accurately described

patient's symptoms.  Possibly a better diagnosis could have been Pelvic Imbalance ICD Diagnosis

Code 719.95 (meaning her hips were misaligned or out of balance) causing her strain when she was

running.  She expressed no problem with the treatment just did not like the Chiropractors choice of

ICD Diagnosis Codes. This is not an example of billing for service not rendered as the government

suggests.

Then there is a 5 minute massage a patient was not happy with the services provided by the

massage therapist calling it a "bogus massage" and not knowing the patients name or date of service

it not known if this was a service considered to be a part of the Chiropractic treatment and not billed

or it was a billable service. Either way, it wasn't that services were not provided it was perhaps one

patient who was not satisfied with their treatment.  Again, a Chiropractic service rendered by Dr

Jeff Spina nothing to do with Jay Spina.

Next patient on April 6, 2017 states she met with a Physician Assistant and was speaking to the

PA for 7 minute and was billed a procedure code of CPT code of 99214 (25 minutes or more) and

it should have been billed a CPT code of 99212 (7 minutes or more).5  According to patient there

---

5- In 2018 there were 10,294 CPT procedural codes which is updated annually and there were 71,932 ICD Diagnosis codes for Drs to select from. References- For 2019, there are a total of 10,294 CPT codes.Here is a breakdown of the numbers: 212 Added.Nov 19, 2018 . 2019 International Classification of Diseases, 10th Revision, Clinical

was a wrong code selected by the physician assistant.   A patient would typically receive an Explanation of Benefits (EOB) with the billing codes 2 months after the date of service, however this patient recalled the time the PA spent with the patient 2 months later.   However, no new patient can be seen in seven minutes, they would typically be seen for 20-30 minutes.   If patient is correct then the wrong code was selected by the physician assistant or the entry was wrong by the data input person as a new patient requires some time, usually more than 7 minutes.

Lastly, the government notes on p. 13 that "in or about 2013 a patient states he was billed an OMT and never received it."   It is hard to tell know with no patient name, date of service or EOB to check patient's records.   However, a patient may not always know what Osteopathic Manipulative Therapy ("OMT") treatment consists of or the insurance EOB may use CPT 98925 ossesous treatment with joint mobilization. Because a patient did not know the terms of the service that was rendered or on the patient's EOB – does not mean the service was not provided to the patient.   The governments statistics reveal 4 patients. One left and was billed by the chiropractor incorrectly, one patient did not like the diagnosis code the Chiropractor chose, another patient did not like the massage they were given in the Chiropractic department and another thinks he did not receive OMT or Osseous manipulation and last one was the patient saw the Dr for an initial visit and the physician assistant may have selected the wrong code on the initial visit as normally initial visit is 25- 30 minutes and patients states she was there for 7 minutes.   In the seven years there were thousands of patients treated by 29 licensed professionals.   The total patients the government cites to is four in this seven-year period.

---

Modification (ICD-10-CM) Codes. October 1, 2018 will bring 279 new codes to ICD-10-CM. Combined with 51 deactivated codes (and 143 revised codes), that brings the total number of ICD-10-CM codes to 71,932.Sep 1, 2018

Several billing errors of 650,000 services rendered over seven does not show a pattern of billing for

services not rendered or a fraudulent pattern. By comparison to few patients referenced here, Dr. Spina

included over 75 video testimonials from satisfied patients. However, in its sentencing submission at p. 26

the Government unfairly diminishes the over 75 patient testimonials and the hundreds of letters by

individuals who voluntarily came forward attesting to the quality care, treatment and compassion they

received at Dolson Avenue Medical. The government says that their testimonials are "worthy of little or any

weight" but yet the four they point to deserve greater consideration. Seventy-five patients videos and

hundreds of written testimonials certainly deserve greater weight then four.

## VII.    Double Billing – Congruent Care

The government concedes that in some instances double billing for the same day of service

is perfectly acceptable. The government states "a medical provider can bill both a private insurer or

Medicare in conjunction with no-fault or Worker's Compensation for a patients care on the same

day, [but] both insurers should not both be billed for the total costs of the same procedure or

treatment for the same injury. " (Govt. submission at p. 13) There may have been occasions were

two providers were billed for the same date of services the providers at Dolson were treating two

different injuries-a perfectly acceptable practice.

For example, with Worker's Compensation patients, Worker's Compensation will only

cover treatment for body parts that were injured at the work place. (i.e., low back)  If the patient has

other complaints or pains not related to the injury (i.e headaches) this condition can be  treated on

the same day  as the Worker's Compensation injury. The headaches would be would be billed

separately under the patients private insurance. Workers Compensation is not responsible for paying

for treatment related to headaches and the private insurance is not responsible for treatment to the

low back work injury.

In government Ex. 60 it references three different family members who were receiving treatment at DAM. Patients Hugh and Brendan mistakenly seem to have had the same diagnosis and James Spina was asking his brother Jeff to address this issue. Without know the full details of the charts and billings allows for this email to be taken out context to support the government's narrative.

Without looking at the charts and billing for these patients It cannot be verified whether this is a perfectly acceptable situation as the government concedes, where two providers are being billed for the same day of service for separate injuries. It could have also been the perfectly acceptable situation were the patient Brendan was being treated for an injury under no-fault and went to an IME and his insurance denied further treatment and he continued to experience pain and receive treatment billed under his private insurance for the additional treatments no longer covered by his no-fault insurance.

It could have also been the situation where there is an intervening onset of a different injury that requires treatment that No-Fault will not cover. It could be a mistake in billing of Brendan and Hugh. With all these potential variables and without analyzing each chart and billing on a case-by-case basis it cannot be established by a preponderance that there was any improper double billing.

The government goes on to parenthetically state "that they were able to double bill, in part, because of the multiple different medical corporations and providers operating out of the same location." However, Multiple corporations has nothing to do with services rendered or services billed. The services rendered are mandated by the New York State Scope of practice and Medical Treatment Guidelines- Medical doctors do not perform Chiropractic Spinal Manipulation and Chiropractors do not do medical procedures such as prescribe medication or give injections.

Therefore, referral properly exist.  Many patients have a PCP or specialist such as orthopedist, which referred them to the office and will go back to them for any necessary follow up medical treatment.  While other patients do not have a PCP (Primary Care Provider) and they may ask for a referral to a PCP or may decide to see one of the Drs in the office on Dolson Avenue. This is routinely done at one location for example Crystal Run Medical Facility, Hackensack Hospital and Montefiore have physical therapy, chiropractic, neuorology in house on campus where doctors routinely refer patients for treatment. So different specialties exist in Physical Medicine (Chiropractic, Physical Therapy, Physiatrist & Rehabilitation to name a few) just like they do in Internal Medicine has cardiologist, pulmonologist, endocrinologist). These types of multi-speciality practices exist in the health care field and referrals need to be made to various specialties. Chiropractors and Physical Therapy services do not address all types of physical conditions and referrals need to be made to other practitioners.

Furthermore, the vast majority of the services rendered by the licensed providers are Physical Therapy and Chiropractic services, which treat muscle, bone, nerve and joint pain which require pre authorization.

Courts have found in health fraud cases that extrapolation, such as the government wishes to employ here by referencing a few patients when over 14,000 were treated, is not permissibly way to reasonably estimate loss or restitution. Each separate patient presents the question of whether certain services furnished to individual patients were medically necessary. To answer that question adequately, the government (like the plaintiffs in the health care fraud false claims act cases) must conduct a highly fact-intensive inquiry involving medical testimony after a thorough review of the detailed medical chart of each individual patient. Accordingly, such claims involving medical necessity are not suitable for statistical sampling. *See* United States *ex rel.* Michaels v. Agape

Senior Cmty., Inc., No. CA 0:12-3466-JFA, 2015 WL 3903675, at *8 (D.S.C. June 25, 2015), *order corrected*, No. CA 0:12-3466-JFA, 2015 WL 4128919 (D.S.C. July 6, 2015), and *aff'd in part, appeal dismissed in part sub nom.* United States *ex rel.* Michaels v. Agape Senior Cmty., Inc., 848 F.3d 330 (4th Cir. 2017). In *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012). A statistical estimate may provide a sufficient basis for calculating the amount of loss caused by a defendant, but in *Hebron*, like here, the United States's statistical analysis was flawed. In *Hebron* The United States's statistician identified a representative statistical sample encompassing 357 bills contained throughout 264 patient files, but the United States found only 210 of those files. The United States did not present evidence that the 210 patient files still formed a representative sample of bills without the missing fifty-four files. Furthermore, it does not appear that the district court even realized that the fifty-four files were missing and it definitely did not make a finding as to whether they were fraudulent. Therefore, the accuracy of the extrapolation method was flawed and called into question.

In *United States v. Klein*, 543 F.3d 206 (5th Cir. 2008), the defendant physician was convicted of billing insurers for personally administering three shots to his patients, when in fact each patient self-administered two of the three shots at home. *Id.* at 208–09. Although the district court awarded restitution in the entire amount that the insurers paid the defendant for the two self-administered shots, including the cost of the medication itself as well as the amount the defendant charged for administering it, this overstated the insurers' losses. *Id.* at 215. Although the doctor fraudulently misrepresented how the medication was administered, "the insurance companies would have had to pay for the medications regardless of the fraud." *Id.* The court then vacated the restitution award and remanded for recalculation with a credit for the value of the medication. *Id.* at 215–16. Here, the court should credit against the loss and restitution amount for the value of the

legitimate services provided that were medically necessary and reduce the fraud loss. *See,* U.S.S.G §2B1.1 comment n. 3(E)(1).

The same must apply here as to claims of double billing and billing for services not provided for fraud loss and restitution purposes extrapolation from a very small statistical sampling is not an appropriate methodology to establish fraud loss or restitution when counter balanced against all of the health care services provided to 14,000 patients.

**VIII – Interfering with a Federal Audit**

The Government mentioned at page 15 of it's memorandum without citing any reports or documents to adequately confirm this representation, that an investigating agent compared only 2 patients files that were provided prior to an audit by a cooperating that there were steps taken to interfere with the audit. However, there is no proof that the defendant interfered with a federal medicare audit. In addition, what the government points may have been updating charts over the course of time as is required by the Medicare Guidelines which state the following… updating patients' condition when the patient's condition improves or worsen with the proper diagnosis codes that best reflects patients' condition is a requirement is proper procedure. https://www.cms.gov/Medicare/Coding/ICD10/Downloads/2020-ICD-10-PCS-Guidelines.pdf

According the to Government Memorandum on p. 15-96% of the 27 files associated with Dr. Garcia had denied claims. However, of the 27 files asked to be pulled by Medicare the auditors only looked at 5 patient files and of those 5, 3 had issues with incomplete information. The audit reveals the following: (1) 5 patient charts reviewed of 502 Medicare patients over a 7 years period less than 1%. (2) Patient treatment denied due to administrative mistake where no times duration noted in therapy session for each therapy were not documented or total time (i.e. 12 minutes on bike for rehab for knee replacement) (3) Medicare performed audit in 2015 and never reach back out to

educational Audit to provider for review and correction as is routine after an audit is done so provider makes necessary corrections. (4) Also report states that claims were denied because the Physical Therapist was not a license therapist. That was incorrect she was licensed at the time of the audit. Arlynn Reyes Tamayo. Licensed PTA.  Lic # 007821- Date of licensure: 07/08/2011. (See, NYSED.gov (licensing)).

### IX.  Medicare Loss Amount is below $1,000,000 and the 2 level enhancement should not be applied under U.S.S.G. § 2B1.1(b)(7)

On p. 19 of its memorandum the government concedes that the $533,258 payments received from Medicare by Chirocare should be deducted from the total $2,678,882 Medicare payments received because Chirocare claims submitted include the accurate ownership information. Dr. Kanter and Dr. Burt's corporation contained accurate ownership information and those numbers of $57,742 and $12,686 should be subtracted and well.

Of the remaining $2,145,079 less Dr. Burt and Dr. Kanter totals equals $2,074,651. Medicare paid $1,337,732 (footnote 6) for legitimate physical therapy services.  As previously mentioned all physical therapy required a prescription from a medical doctor before treatment could be performed. Most of the Medicare patients owing to their age to qualify for Medicare were post-surgical referrals from outside doctors who determined that physically therapy was medically necessary. The medically necessary physical therapy was performed and billed. Similarly, services such as OMT, ($365,831) X-rays, ($119,512) or office visits ($158,528) were determined by the doctors and licensed professionals to be medically necessary and were legitimate health care services and were performed on the Medicare beneficiaries. Under U.S.S.G. § 2B1.1 comment. (n.

---

6 See, Ex. 8

3(E)(i)) the physical therapy fees of $1,337,732, OMT of $365,831, X-rays $119,512; and office visits of $158,528 should be deducted from the $2,074,651 for a total of $93,048, well below the 1,000,000 under §2B1.1(b)(7).

In *United States v. Tariq Mahmood, M.D.*, No. 15-40521 - at *22-23 - (5th Cir. April 14, 2016) the Fifth Circuit vacated defendant's sentence in a health care fraud case after defendant was convicted for resequencing the diagnosis codes at various hospitals in order to bill for more expensive treatments not provided. In vacating the sentence, the Fifth Circuit reasoned that

"Medicare receives value within the meaning of U.S.S.G. § 2B1.1 comment. (n. 3(E)(i)) when its beneficiaries receive legitimate health care services for which Medicare would pay but for a fraud. *Id*.

Likewise, in *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997)(doctor's conviction for Medicare fraud based on performing services that were allegedly not medically necessary vacated since doctor must be given credit for those services which were rendered and necessary when district court used global estimates to determined loss).

Based on the review of 5 out of 502 patients (again less than 1% of Medicare patients) the government argues, without a factual basis, that 50% of Physical Therapy services were not medically necessary. The audit revealed that some of the documentation the physical therapist prepared did not have the times for each physical therapy service rendered to the patient. These were documentation lapses on the part of physical therapists not that treatment was not provided or was not necessary it was that the paperwork was not filled out correctly. This was an administrative error on the part of a few of the physical therapist and if brought to DAMs attention during the Medicare Educational Audit in 2015 corrective action would have been taken. Yet the medicare

audit report was never received by DAM and was only produced in late 2018 after the indictment as part of the discovery in the criminal case.

**X.      A sentence well below the guidelines is warranted because the fraud loss guidelines overstate the severity of the offense.**

The shortcomings of the fraud Guidelines are readily apparent. The unduly punitive guidelines range of 87 to 120 months is driven predominately by the Government's allegations that Dr. Spina is responsible for an actual loss of approximately $3.5 to $9 million, which corresponds to a sixteen or eighteen-level enhancement to Dr. Spina's adjusted guideline range.

When there is a such a drastic disparity between the base offense level of 6 and the 18 level enhancement for the fraud loss a sentencing court must strongly consider a nonguideline sentence. *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) The ratcheting up of the fraud loss guidelines is not a product of any empirical study by the Sentencing Commission but rather congressional enhancements.

Unlike the majority of the Sentencing Guidelines, the fraud Guidelines are not based on empirical data and national sentencing experience. *See, e.g.*, *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (*Underhill, J.*, concurring) (discussing the history of the fraud Guidelines). The Second Circuit has cautioned that where the applicable sentencing guideline is not based on empirical data, courts must use "great care;" otherwise, the Guidelines "can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *United States v. Dorvee*, 616 F.3d at 184.

In addition, by placing a disproportionate emphasis on loss, the fraud Guidelines ignore other sentencing factors that a judge is legally required to consider when imposing a sentence and which are more probative of culpability and the need for punishment. *See, e.g.*, *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (criticizing the loss Guidelines for placing

undue significance on the single factor of loss which is "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence."); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) ("[O]ne of the primary limitations of the loss guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level.")

By "effectively ignor[ing] the statutory requirement that federal sentencing take many factors into account" the fraud Guidelines "effectively guaranteed that many [Guidelines] sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014).[7]

As outlined in great detail in our initial memorandum courts have placed greater significance on the remainder of the § 3553(a) factors as the court should here and have not hesitated to impose sentences significantly below the applicable Guidelines range. Of particular importance is 35539(a)(6) to avoid unwarranted sentencing disparities. *See, e.g., Johnson*, 2018 WL 1997975, at *4-6 (imposing a sentence of 24 months imprisonment where Guidelines range— "overwhelmingly due to the loss enhancement"—was 87-108 months); *Adelson*, 441 F. Supp. 2d at 507 (imposing a sentence of 42 months imprisonment where Guidelines called for a life sentence); *Parris*, 573 F. Supp. 2d at 745 (imposing a sentence 300 months below the low end of the Guidelines range).

A Sentence Substantially Below the Guidelines Range for James Spina is appropriate to avoid unwarranted sentencing disparities. Title 18 U.S.C. § 3553(a)(6) statutorily obligates a federal sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants

---

7 *See also, e.g.*, Daniel Richman, Federal White Collar Sentencing in the United States: A Work in Progress, 76 Law and Contemporary Problems 53, 73 (2013) (Criticizing the fraud Guidelines for placing undue emphasis on a loss amount and noting that "the time and effort spent arriving at [the loss amount] will cast a shadow over the entire sentencing process, at the expense of other factors, even those whose consideration is legally required.")

with similar records who have been found guilty of similar conduct.". See, *United States v. Toohey*, 132 F. App'x 883, 886 (2d Cir. 2005). In defendant's initial memorandum, counsel outlined eighteen cases from courts within the Southern District where the court sentenced the defendants well below the guidelines for defendants who were convicted of the same conduct as James Spina. 8 Based on a review of these cases from within this district a below guideline sentence of 18 to 24

---

8 (1)*United States v. Gateva,* No. 12-cr-171 (SDNY): Defendant convicted of 2 counts of §1349, sentenced to time served with no supervised release and ordered to pay $3,972,736.62 in restitution. (2) *United States v. Gabinskaya,* No. 12-cr-171 (SDNY): Defendant convicted of 2 counts of §1349 and sentenced to 12 months and 1 day prison time, running concurrently, with 3 years supervised release. (3) *United States v. Grinberg,* No. 12-cr-171 (SDNY): Defendant convicted of 1 count of §1349, sentenced to 24 months prison time and 3 years supervised release, and ordered to pay $943,976.00 in restitution. (4) *United States v. Katsman,* No. 12-cr-171 (SDNY): Defendant convicted of 2 counts of §1349 and sentenced to time served concurrently with sentence in EDNY and 3 years supervised release. (5) *United States v. Lereah,* No. 12-cr-171 (SDNY): Defendant convicted of 1 count of §1349 and sentenced to 2 years probation. (6) *United States v. Lipis,* No. 12-cr-171 (SDNY): Defendant convicted of 1 count of §1349 and sentenced to 12 months and one day prison time, running concurrently, and ordered to pay $1,408,614.94 in restitution. (7) *United States v. Morgon,* No. 12-cr-171 (SDNY): Defendant convicted of 1 count of §1349, sentenced to time served and ordered to pay $2,008,817.51 in restitution. (8) *United States v. Ostrumski,* No. 12-cr-171 (SDNY): Defendant convicted of 1 count of §1349, sentenced to 36 months prison time, 3 years supervised release and ordered to pay $2,815,622.93 in restitution. (9) *United States v. Sukhman,* No. 12-cr-171 (SDNY): Defendant convicted of 2 counts of §1349, sentenced to 3 years probation including home confinement and ordered to pay $14,311,106.00 in restitution. (10) *United States v. Treysler,* No. 12-cr-171 (SDNY): Defendant convicted of 1 count of §1349, sentenced to 42 months prison time, 3 years supervised release and ordered to pay $3,337,195.65 in restitution. (11) *United States v. Zaidman,* No. 12-cr-171 (SDNY): Defendant convicted 1 count of §1349 and sentenced to 12 months and 1 day prison time, 3 years supervised release and ordered to pay $2,114,870.12 in restitution. (12) *United States v. Seitz,* No. 12-cr-921 (SDNY): Defendant convicted of one count of §1349 and sentenced to 24 months prison time and ordered to pay $2,703,137.89 in restitution. (13) *United States v. Arias,* No. 13-cr-51 (SDNY): Defendant convicted of one count of §1349 and sentenced to time served and 3 years supervised release and ordered to pay $7,000,000.00 in restitution. (14) *United States v. Hershan,* No. 13-cr-743 (SDNY): Defendant convicted of one count of §1349 and sentenced to time served, 3 years supervised release including 700 hours community service, and ordered to pay $1,136,847.79 in restitution and a $7,500.00 fine. (15) *United States v. Maruri,* No. 13-cr-833 (SDNY): Defendant convicted of one count of §1349 and sentenced to 45 days prison time, 2 years supervised release and ordered to pay $7,503,605.00 in restitution. (16) *United States v. Rigo,* No. 13-cr-897 (SDNY): Defendant convicted of one count of §1349 and sentenced to 38 months prison time, 3 years supervised release and ordered to pay $2,900,00.00 in restitution. (17) *United States v. Silvestre,* No. 14-cr-72 (SDNY): Defendant convicted of one count of §1349 and sentenced to

months with restitution would be sufficient but not greater than necessary for James Spina.

## CONCLUSION

For the reasons stated in this reply and in our initial sentencing memorandum it is respectfully requested that the Court impose a non-Guidelines sentence of **18 to 24 months** substantially below the Guideline range. Such a sentence is fair and reasonable and sufficient, but not greater than necessary, to achieve the goals of sentencing under of all of the factors od 18 U.S.C. § 3553(a).

Dated: October 22, 2020                    Respectfully submitted,
                                          *Attorneys for Defendant James Spina*

                                          HODGES, WALSH & BURKE, LLP

---

time served, 3 years supervised release and ordered to pay $9,000,000.00 in restitution. (18) *United States v. Batisti-Magra,* No. 14-cr-142 (SDNY): Defendant convicted of one count of §1349 and sentenced to 18 months prison time, 3 years supervised release and ordered to pay $3,500,000.00 in restitution.

By: _____ *Michael K. Burke* _____

       Michael K. Burke, Esq.
       55 Church Street, Suite 211
       White Plains, New York 10601
       T. (914) 385-6000

       -and-

       HARFENIST KRAUT & PERLSTEIN, LLP

By: _____ *Steven J. Harfenist* _____

       Steven J. Harfenist
       2975 Westchester Avenue, Suite 2E1
       Purchase, New York 10577
       T. (914) 701-0800

TO:

Clerk of the Court
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601
*(Via ECF)*

United States District Judge Honorable Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601
*(Via ECF)*

Nicholas Bradley, Esq.
Assistant United States Attorney
Southern District of New York
300 Quarropas Street
White Plains, New York 10601
*(Via ECF)*

All Co-Counsel of Record
*(Via ECF)*