UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES SPINA, | |
| Petitioner, | No. 23-CV-5885 (KMK) |
| v. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |
| UNITED STATES OF AMERICA | |
| v. | No. 18-CR-625 (KMK) |
| | <u>OPINION & ORDER</u> |
| JAMES SPINA, | |
| Defendant. | |

<u>Appearances:</u>

James Spina
*Pro Se Petitioner*

Nicholas S. Bradley, Esq.
United States Attorney's Office
New York, NY
*Counsel for Respondent*

KENNETH M. KARAS, United States District Judge:

James Spina ("Petitioner") has filed a Petition for a Writ of Habeas Corpus (the

"Petition"), pursuant to 28 U.S.C. § 2255, to vacate, set aside, or correct his judgment of

conviction, entered on his April 13, 2021, which included a sentence of 108 months'

imprisonment, imposed after Spina pled guilty, pursuant to a plea agreement, to one count of

conspiracy to commit healthcare fraud, in violation of Title 18, United States Code, Section 1349.  (*See generally* Pet. for Writ of Habeas Corpus ("Pet.") (Civ. Dkt. No. 1, Case No. 23-CV-5885; Cr. Dkt. No. 249, Case No. 18-CR-625).)[1]  For the following reasons, the Petition is denied.

I.  Background

    A.  Factual Background

        1. Offense Conduct

The charges against Petitioner arose from an investigation into a long-running scheme operated out of his Dolson Avenue Medical practice ("DAM") in Middletown, New York that provided a variety of pain management and  rehabilitation services.  (Final Presentence Investigation Rep. ("PSR") ¶ 13 (Cr. Dkt. No. 32).)[2]  Besides DAM, at least nine other corporations billed from the DAM location during the relevant period.  (PSR ¶ 14).

A number of other individuals nominally owned the DAM Practice and its affiliated businesses.  (PSR ¶¶ 16; 17.)  In reality, however, Petitioner and his brother, both practicing chiropractors, owned and operated the different businesses, including the medical corporations.  (*Id*. at ¶ 16.)  They made critical decisions regarding finances, employees, and, most importantly, billing.  (*Id*. at ¶ 16.)  Indeed, Petitioner operated the DAM Practice to maximize reimbursements and his own profits.  (*Id.* at ¶ 16.)  By masking the ownership and control of the associated

---

[1] Certain of the Parties' papers were filed on Petitioner's criminal docket, Case No. 18-CR-625, and certain on Petitioner's civil docket, Case No. 23-CV-5885-1.  The docket citations indicate on which docket each document was filed ("Civ." for documents on the civil docket, and "Cr." for documents on the criminal docket).

[2] "Mot." refers to the Section 2255 motion, and citations to page numbers in the motion refer to the page numbers assigned by CM/ECF; "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office in connection with the defendant's sentencing.

businesses, Petitioner used different entities to bill for medical services for a single patient.  (*Id.* at ¶ 21.).  This reduced the volume of bills submitted by any one corporation, and thus decreased the risk of triggering alarm from insurers.  (*Id.* at ¶¶ 16-17, 21.)

Petitioner and his co-conspirators engaged in numerous fraudulent practices, including billing for unnecessary or never-performed services or procedures, double billing, *i.e.*, billing two insurance providers for the same medical service or procedure, and altering and falsifying medical records.  (*Id.* at ¶¶ 23-29.)  To conceal the fraudulent scheme, Petitioner obstructed audits conducted by Medicare and other insurance providers by fabricating and withholding patient records.  (*Id.* at ¶ 16).

As part of Petitioner's fraudulent practices, Petitioner encouraged Charles Bagley, a neurologist who worked at the Practice, to administer and bill for lucrative facet injections, despite being aware that several of Bagley's patients suffered adverse reactions from that delicate and dangerous procedure.  (*Id.* at ¶ 33.)  In March 2017, a patient of the DAM Practice died shortly after receiving a facet injection from Bagley.  (*Id.*)

On August 29, 2018, a grand jury returned an Indictment charging Petitioner and others with conspiracy to commit healthcare fraud (Count One), healthcare fraud (Count Two), and obstruction of a federal audit (Count Three).  (*See* Indictment (Cr. Dkt. No. 2); PSR ¶ 34.)

### 2. Guilty Plea

On May 2, 2019, Petitioner, represented by his counsel, and the Government executed a Plea Agreement, which contained the terms under which Petitioner agreed to plead guilty to conspiracy to commit healthcare fraud, as charged in Count One of the Indictment.  (*See* Gov't Mem. in Opp., Ex. A, at 1-7 (Cr. Dkt. No. 253).

In the Plea Agreement, the Parties stipulated that the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.") applied to Petitioner's sentencing as follows: The base offense level was six, under U.S.S.G. § 2B1.1(a)(2), because the offense carried a statutory maximum prison term of 10 years; two levels were added, under U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved 10 or more victims; two levels were added, under U.S.S.G. § 2B1.1(b)(10)(C), because the offense involved sophisticated means; two levels were added, under U.S.S.G. § 2B1.1(b)(16)(A), because the offense involved conscious or reckless risk of death or serious bodily injury; four levels were added, under U.S.S.G § 3B1.1(a), because Petitioner was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; and three levels were subtracted, under U.S.S.G. § 3E1.1, for acceptance of responsibility. (*Id.* at 2-3.)

The Parties disputed two aspects of the Guidelines calculation. First, they disputed the applicable loss amount under U.S.S.G. § 2B1.1(b)(1): the Government contended that a 22-level enhancement applied because the loss exceeded $25 million but did not exceed $65 million, and Petitioner contended that a 16-level enhancement applied because the loss exceeded $1.5 million but did not exceed $3.5 million. Second, the Parties disputed the applicability of a two-level enhancement, under U.S.S.G. § 2B1.1(b)(7), for loss to a government healthcare program—here, Medicare—exceeding $1 million. (*Id.* at 2.)

The bottom line is that the Parties agreed in the Plea Agreement that the total offense level was either 29 or 37. (*Id.* at 3.) They further agreed that Petitioner had zero criminal history points, resulting in a Criminal History Category of I. (*Id.*) As a result, the Parties agreed that the applicable Guidelines range was either: (i) 87 to 108 months' imprisonment, if the loss amount was more than $1.5 million but no greater than $3.5 million and the loss to Medicare did

not exceed $1 million; or (ii) 210 to 262 months' imprisonment, if the loss amount was more

than $25 million but no greater than $65 million and the loss to Medicare exceeded $1 million.

However, under U.S.S.G. § 5G1.2, because Count One carried a statutory maximum of 120

months' imprisonment, the resulting Guidelines range stipulated in the Plea Agreement became

87 to 120 months' imprisonment (the "Stipulated Guidelines Range"). (*Id.*).

       In addition to stipulating to the applicable Guidelines range, the Parties stipulated "that

neither a downward nor an upward departure from the Stipulated Guidelines Range" was

warranted. (*Id.*). The Parties further agreed not to seek "any departure or adjustment pursuant to

the Guidelines that is not set forth" in the Plea Agreement or "in any way suggest that the

Probation Office or the Court consider such a departure or adjustment under the Guidelines."

(*Id.*). The Parties agreed, however, that "either party may seek a sentence outside of the

Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence

pursuant to Title 18, United States Code, Section 3553(a)," and that "nothing in this Agreement

limits the right of the parties . . . to present to the Probation Office or the Court any facts relevant

to sentencing." (*Id.* at 3-4.) Petitioner also agreed that he would "not file a direct appeal . . . of

any sentence within or below the Stipulated Guidelines Range of 87 to 120 months'

imprisonment," and that he would not "appeal any term of supervised release that is less than or

equal to the statutory maximum" or "any fine that is less than or equal to $400,000." (*Id.* at 4-5.)

       On May 2, 2019—the same day the Parties executed the Plea Agreement—Petitioner,

pursuant to the terms of the Plea Agreement, pled guilty to Count One of the Indictment before

Judge McCarthy, who conducted a careful and thorough hearing that complied with Rule 11 of

the Federal Rules of Criminal Procedure. (*See generally* Plea Tr. (Cr. Dkt. No. 22).)

At the outset of the proceeding, after placing the defendant under oath, Judge McCarthy inquired about whether—and ultimately found that—Petitioner was competent to plead guilty. (*See id*. at 5-6.)  Judge McCarthy then confirmed that Petitioner consented to have his plea taken by Judge McCarthy and had discussed the case with his attorney and was satisfied with his attorney's representation.  (*See id.* at 6-11.)  Thereafter, Petitioner was advised of the elements of the crime to which he would be pleading guilty, and the maximum penalties that he faced as a result of that guilty plea.  (*Id.* at 13-14, 28-29.)  Judge McCarthy also confirmed that Petitioner was fully aware of the rights he was giving up by pleading guilty, including his rights: (a) to persist in his previously entered plea of not guilty; (b) to a speedy and public jury trial where he would be presumed innocent and the Government would bear the burden of proving his guilt beyond a reasonable doubt; (c) to the assistance of counsel, including court-appointed counsel if necessary, at trial and at every other stage of the proceedings; (d) to confront and cross- examine witnesses; (e) to testify, present evidence, and compel the attendance of witnesses; and (f) against compelled self-incrimination.  (*See id.* at 25-27.)  Petitioner stated unequivocally that he was willing to waive those rights by pleading guilty.  (*See id.* at 27.)  Petitioner also confirmed that his decision to plead guilty was voluntary and made of his own free will, and was not influenced by any threats, coercion, or improper pressure.  (*See id.* at 13, 33-34.)

Petitioner acknowledged that he had reviewed the Plea Agreement with his attorney and understood its terms.  (*See id.* at 12-13.)  He also stated that he understood that he was giving up his right to appeal any sentence within or below the Stipulated Guidelines Range of 87 to 120 months' imprisonment, any fine of $400,000 or less, or any lawful sentence of supervised release.  (*See id.* at 24-25.)

When it came to admiting his guilt, Petitioner stated, in relevant part: "In 2011 to 2017, I did knowingly and intentionally agree with others to participate with medical corporations that billed medical insurance companies for services rendered. These corporations falsely appeared as they were owned by a medical doctor, but were in fact controlled by myself and my brother, in which we exercised control over the finances and the expenses of these corporations. Claims were submitted to healthcare insurance companies to obtain payment. We thereby financially benefitted from these corporations, which were otherwise—which we were not otherwise entitled to under the New York State Law. I knew what I was doing was in violation of the law." (*Id.* at 43-44). Petitioner also confirmed that, at the time he submitted the claims, he knew that the ownership information on the bills was fraudulent. (*See id.* at 44.) The Government also provided a detailed description of the evidence it would prove at trial regarding the defendant's leadership role in the DAM healthcare fraud scheme. (*Id.* at 29-32). After conducting this thorough plea allocution, Judge McCarthy confirmed that an adequate factual and legal basis supported the plea. (*See id.* at 33-45.)

Following Judge McCarthy's report and recommendation (*See id.* at 45-46; R. & R. (Cr. Dkt. No. 14)), the Court accepted the defendant's plea allocution and adjudged the defendant guilty. (Order Accepting Plea Allocution (Cr. Dkt. No. 13).)

3. <u>Sentence</u>

Before sentencing, the Probation Office prepared the Presentence Report. The Probation Office adopted the Government's positions in the Plea Agreement and determined that Petitioner's total offense level was 37. (*See* PSR ¶¶ 6, 39-53, 88-89.) Consistent with the Plea Agreement, the Probation Office determined that the defendant had zero criminal history points and was in Criminal History Category I. (*See* PSR ¶ 56.) Accordingly, the Probation Office

determined that the Guidelines sentencing range would be 210 to 262 months' imprisonment but for the 120-month statutory maximum penalty, which resulted in an advisory Guidelines sentence of 120 months' imprisonment. (*See* PSR ¶ 88.)

Petitioner objected to the Probation Office's adoption of the Government's loss calculations, and the Probation Office, in response, acknowledged the disputed issues regarding the loss amounts but declined to change the Presentence Report. (PSR at 22.) The Probation Office recommended a Guidelines sentence of 120 months' imprisonment. (PSR at 24.)

Before sentencing, Petitioner's counsel notified the Court that the Parties had resolved their dispute in the Plea Agreement about the applicable loss enhancement under U.S.S.G. § 2B1.1(b)(1) by agreeing that the loss amount exceeded $3.5 million but did not exceed $9.5 million, resulting in an 18-level enhancement to the offense level under U.S.S.G. § 2B1.1(b)(1)(J). (*See* Letter from Michael Burke, Esq. to Court (Feb. 24, 2020) 1 (Cr. Dkt. No. 42).)

In his sentencing submission, Petitioner asked the Court to impose a below-Guidelines sentence of 18 to 24 months' imprisonment. (*See* Def.'s Sentencing Submission ("Def.'s Sent. Sub.") 7 (Cr. Dkt. No. 44).) He argued that the loss-amount enhancements were unnecessarily harsh, and that the sentencing factors in 18 U.S.C. § 3553(a) weighed in favor of a below-Guidelines sentence given his personal background and the need to avoid unwarranted sentencing disparities. (*See id.*).

The Government requested a Guidelines sentence of 120 months' imprisonment. (*See* Gov't. Sentencing Submission ("Gov't.'s Sent. Sub.") 1 (Cr. Dkt. No. 50).) Among other things, the Government argued that Petitioner was the mastermind of the fraudulent scheme that lasted

more than seven years and that Petitioner's actions resulted in tragic and even fatal consequences for patients. (*See id*. at 31.)

Sentencing happened on April 13, 2021. (*See* Sentencing Tr., (Cr. Dkt. No. 120).)  The Court addressed the applicable Guidelines calculation , noting that 18-level enhancement for loss under U.S.S.G. § 2B1.1(b)(1) applied, in light of the Parties' post-plea agreement. (*See id.* at 5.) The Court then heard argument about the applicability of the two-level enhancement under U.S.S.G. § 2B1.1(b)(7). (*See id*. at 5-32.)  Following argument, the Court concluded that the Government had failed to meet its burden of showing that Medicare losses exceeded $1 million, and therefore ruled that he would not apply the enhancement. (*See id*. at 31-32.)  Accordingly, the Court determined that the total offense level was 31, with an applicable Guidelines range of 108 to 120 months' imprisonment. (*See id.* at 32-33.)

The Court also considered and addressed Petitioner's objections to certain factual statements in the Presentence Report. (*See id*. at 34-38.)   The Court agreed to remove a portion of the Presentence Report characterizing "everything" about the Practice as fraudulent, and further agreed to add a sentence noting that Petitioner disputed whether certain lease and marketing agreements were illegitimate. (*See id.* at 34-43.)  The Court also heard from the Government, defense counsel, and Spina himself about the appropriate sentence. (*See id.* at 43-107.)

After hearing from the Parties, the Court formally adopted the Guidelines calculation in the Presentence Report, as modified by the Parties' post-plea agreement and the Court's determination that the two-level enhancement under U.S.S.G. § 2B1.1(b)(7) did not apply, resulting in a Guidelines Sentencing range of 108 to 120 months' imprisonment. (*See id.* at 107-109.)

Next, the Court considered the 18 U.S.C. § 3553(a) sentencing factors. (*See id*. at 110-19.) The Court acknowledged Petitioner's claims about his good deeds and philanthropy, and determined that "good deeds should be take[n] into consideration." (*Id*. at 111.) The Court also found that not everything about the Practice "was fraudulent." (*Id*. at 112-13.) But the Court emphasized the seriousness of the offense, observing that it was "sophisticated," was "long running," and involved an "extraordinary amount of money." (*Id.* at 114-15.) The Court further noted that Petitioner encouraged the use of dangerous facet injections even after a patient death and other adverse reactions. (*See id.* at 115-16.) The Court discussed the need for both specific and general deterrence, explaining that medical professionals are "some of the most admirable people in our society," and that when they engage in "a massive, long-running, callous fraud, . . . there needs to be a consequence that dissuades people" from engaging in such conduct. (*Id.* at 116-17.) Responding to Petitioner's claims regarding the Guidelines loss enhancements, the Court found that "this is a case where the loss amount is not the sole driver," and that the Guidelines range of 108 to 120 months' imprisonment "doesn't overrepresent the seriousness of the criminal conduct." (*Id.* at 118-19.)

After explicitly considering all the Section 3553(a) factors, the Court imposed a Guidelines sentence of 108 months' imprisonment, the bottom of the Guidelines range. (*See id.* at 119). The Court also imposed a three-year term of supervised release, a $100 mandatory special assessment, forfeiture of $9,105,741.61, and restitution of $9,760,555.20. (*Id.* at 119-20).

### 4. Appeal

In spite of the appeal waiver, Petitioner's counsel filed a timely notice of appeal, which claimed that Petitioner's sentence was substantively unreasonable. (*See* Def.-Appellant's Brief

of Appeal, No. (App. Dkt. No. 44), Case No. 21-CR-1453.)[3]  The Government moved to dismiss

the appeal based on Petitioner's waiver of his right to appeal.  (Gov't.'s Mot. to Dismiss App. ¶ 7

(App. Dkt. No. 61).)  On July 20, 2022, the Court of Appeals granted the Government's motion

and dismissed the defendant's appeal.  (Summ. Dismissal (App. Dkt. No. 78).)

### B.  Procedural History

Spina timely filed the Petition on July 5, 2023.  (Mot. to Vacate ("Mot.") (Cr. Dkt. No.

249).)  The Court issued an Order to Answer on July 25, 2023.  (Order to Answer (Cr. Dkt. No.

250).)  Pursuant to that Order, the Government filed its Opposition on September 25, 2023.

(Gov't. Mem. in Opp. to Mot. ("Gov't. Mem.") (Cr. Dkt. No. 253).)  Petitioner filed his Reply on

October 2, 2023.  (Def. Rep. (Oct. 2, 2023) (Dkt. No. 254).)

## II.  Discussion

### A.  Standard of Review

#### 1. Habeas Petitions

A prisoner in federal custody may move to vacate, set aside, or correct his sentence only

"upon the ground that the sentence was imposed in violation of the Constitution or laws of the

United States, or that the court was without jurisdiction to impose such sentence, or that the

sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral

attack."  28 U.S.C. § 2255(a).[4]  "Because collateral challenges are in 'tension with society's

---

[3] Citations to the Second Circuit Appeal will be indicated by an "App." before the Docket Number.

[4] 28 U.S.C. § 2255(a) provides, in full:

A prisoner in custody under sentence of a court established by Act of Congress
claiming the right to be released upon the ground that the sentence was imposed in
violation of the Constitution or laws of the United States, or that the court was
without jurisdiction to impose such sentence, or that the sentence was in excess of
the maximum authorized by law, or is otherwise subject to collateral attack, may
move the court which imposed the sentence to vacate, set aside or correct the
sentence.

strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.'" *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (quoting *Ciak v. United States*, 59 F.3d 296, 301 (2d Cir. 1995)). To prevail on a collateral attack of a final judgment under § 2255, a petitioner must demonstrate either the existence of a "constitutional error . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quotation marks omitted); *accord Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000); *Rodriguez v. United States*, No. 11-CV-2957, 2013 WL 6171618, at *3 (S.D.N.Y. Nov. 25, 2013), *aff'd*, 679 F. App'x 41 (2d Cir. 2017).

In ruling on a § 2255 petition, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). A hearing is not required where the petitioner's allegations are "vague, conclusory, or palpably incredible." *Machibroda v. United States*, 368 U.S. 487, 495 (1962). To justify a hearing, the petition "must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief." *See Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013). Finally, because Petitioner filed his initial Petition pro se, the Court construes the Petition and his other submissions "liberally and interpret[s] [the] to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quotation marks omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (italics and citation omitted)).

2. Ineffective Assistance

The Sixth Amendment of the United States Constitution provides that a criminal defendant shall enjoy the right to effective assistance of counsel. *See Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam). A claim for ineffective assistance of counsel is analyzed under the two-part test set out by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984): to be entitled to relief, a petitioner must show that (1) his or her attorney's conduct was constitutionally deficient because it fell below an "objective standard of reasonableness," *id.* at 687–88, and (2) the petitioner was prejudiced by the ineffective representation—that is, but for the deficiency, there is a reasonable probability that "the result of the proceeding would have been different," *id.* at 694.

To determine whether counsel's conduct is deficient under the first prong, "the court must determine whether, in light of all of the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Lindstadt v. Keane*, 239 F.3d 191, 198–99 (2d Cir. 2001) (alterations and quotation marks omitted). A petitioner cannot meet this prong based solely on disagreements with counsel's strategy or advice. Indeed, there is a "strong presumption" that counsel's conduct fell within the vast spectrum of reasonable assistance, and it is the petitioner's burden to demonstrate "that counsel's representation was unreasonable under prevailing norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *see also Dunn v. Reeves*, 594 U.S. 731, 739 (2021) ("[W]e have often explained that strategic decisions . . . are entitled to a strong presumption of reasonableness [since] [d]efense lawyers have limited time and resources, and so must choose from among countless strategic options." (quotation marks and citation omitted)); *Henderson v. Martuscello*, No. 10-CV-5135, 2013 WL 6463348, at *15 (S.D.N.Y. Dec. 10,

2013) ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, even where counsel adopts a course of action (or inaction) that seems risky, unorthodox[,] or downright ill-advised." (citation and alteration omitted)). Thus, to satisfy this prong, a petitioner must demonstrate that his or her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In assessing counsel's conduct, "a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 533, 533 (2d Cir. 1994) (citations omitted) (quoting *Strickland*, 466 U.S. at 690).

To satisfy the second prong, "[the petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding below would have been different." *United States v. Caracappa*, 614 F.3d 30, 49 (2d Cir. 2010) (quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693. "'[P]urely speculative' arguments about the impact of an error do not establish prejudice." *DeCarlo v. United States*, No. 11-CV-2175, 2013 WL 1700921, at *4 (S.D.N.Y. Apr. 17, 2013) (alteration in original) (quoting *United States v. Weiss*, 930 F.3d 185, 199 (2d Cir. 1991)). Moreover, "a court hearing an ineffectiveness claim must consider the totality of the evidence . . . . [A] verdict or conclusion only weakly supported by the record is more likely to

have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695–96. The Supreme Court has instructed that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the [petitioner] makes an insufficient showing on one." *Id.* at 697.

Finally, with respect to ineffective assistance of appellate counsel claims, "it is not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (explaining that a petitioner "may establish constitutionally inadequate performance if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker"). Moreover, to "establish prejudice in the appellate context, a petitioner must demonstrate that there was a 'reasonable probability' that [his] claim would have been successful before the [Court of Appeals]." *Id.* at 534 (internal citation and quotation marks omitted).

B.  Analysis

Petitioner claims his appellate counsel was constitutionally ineffective for failing to raise arguments concerning supposed deficiencies in his plea allocution. First, he contends that Judge McCarthy did not ensure he understood the nature of the charge—as required by Rule 11(b)(1)(G)—because the Court failed to "personally" inform him "of the elements of the offense," and that the Government "incorrectly stated the elements of conspiracy to commit healthcare fraud." (Mot. at 6.) Second, Petitioner asserts there was no factual basis for his guilty plea under Rule 11(b)(3) because he only admitted during his allocution that he "knew that his conduct violated the 'New York State Medical Practice Law'" and not a "federal violation of conspiracy to commit healthcare fraud." (*Id.* at 6-7.)

Both claims are contradicted by the indisputable record and therefore lack any merit.

      1. <u>Nature of the Charge – Rule 11(b)(1)(G)</u>

Petitioner's claims notwithstanding, there is no valid basis to dispute that Judge McCarthy informed Petitioner of, and made sure the defendant understood, "the nature of each charge to which the defendant [was] pleading." Fed R. Crim. P. 11(b)(1)(G). In doing so, and contrary to Petitioner's self-serving assertion, Judge McCarthy did not need to recite "the elements of the offense" personally (Mot. at 6.) The purpose of Rule 11(b)(1)(G) is to "assist the district judge in making the constitutionally required determination that a defendant's guilty plea is truly voluntary." *United States v. Maher*, 108 F.3d 1513, 1520 (2d Cir. 1997). As the Supreme Court long ago emphasized, "[t]he nature of the inquiry required by Rule 11 must necessarily vary from cases to case and, therefore . . . matters of reality, and not mere ritual, should be controlling." *McCarthy v. United States*, 394 U.S. 459, 467 n.20 (1969). "What is essential . . . is that the court determine by some means that the defendant actually understands the nature of the charges." *United States v. Murphy*, 942 F.3d 73, 85 (2d Cir. 2019) (quoting *Maher*, 108 F.3d at 1521). To satisfy this rule, the Court "need not adopt a particular method of inquiry or recite a set of magic words." *United States v. Saleh*, 2023 WL 2530742, at *1 (2d Cir. Mar. 16, 2023) (internal citation omitted). Indeed, the Second Circuit has explained that "Rule 11 does not require that the judge personally explain the elements of each charge to the defendant on the record as long as the record accurately reflects that the nature of the charge and the elements of the crime were explained to the defendant by his own, competent counsel." *United States v. Farooq*, 58 F.4th 687, 692 (2d Cir. 2023) (internal citation and quotation marks omitted). The Court may do so by "asking the defendant whether he understood the nature of the offense to which he was entering a guilty plea, asking the defendant to describe his participation

in the offense, or requesting that the government describe the elements of the offense." *United States v. Spear-Zuleta*, 2022 WL 17347243, at *4 (2d Cir. Dec. 1, 2022) (internal citations and quotation marks omitted); *see also United States v. Balde*, 943 F.3d 73, 94 (2d Cir. 2019) (noting that a district court can satisfy Rule 11(b)(1)(G) by requesting the Government to "describe the elements of the offense").

Here, Judge McCarthy confirmed Petitioner was competent to plead guilty; that he discussed the case with his attorney and was satisfied with his representation; and that he had reviewed the Plea Agreement with his attorney and understood its terms. (Plea Tr. 4-14.) Judge McCarthy also described each of the three counts of the Indictment to Petitioner, including the conspiracy charge to which Petitioner pled, and confirmed Petitioner understood them. (*Id.* at 9-11.) Finally, Judge McCarthy also confirmed that, per the Plea Agreement, Petitioner understood he was agreeing to plead guilty to conspiracy to commit healthcare fraud from 2011 through September 2017, in violation of 18 U.S.C. § 1349. (*Id.* at 13.) In light of this record, it defies belief that Petitioner could claim he was not informed of the nature of the charge he pleaded guilty to, or that such a claim would be in any way meritorious on appeal. *See Saleh*, 2023 WL 2530742, at *1-2 (Rule 11 satisfied when the Court, among other things, "read the charges from the indictment"); *Spear-Zuleta*, 2022 WL 17347243, at *4 (Rule 11 satisfied when defendant confirmed he had read the indictment and discussed it with counsel, the Government described the elements of the offense, and also summarized the evidence it would introduce at trial).

Second, and just as fatal is to Petitioner's claim, the Government correctly described the elements of the offense conduct during the plea allocution. Specifically, the Government explained:

> Mr. Spina is pleading to Count One of the indictment, which is conspiracy to commit healthcare fraud. To prove a conspiracy to commit healthcare fraud in violation of Section – Title 18, United States Code, Section 1349, the Government must demonstrate:
>
> One, that two or more people entered into an agreement to commit healthcare fraud; and
>
> Two, that each defendant knowingly and intentionally joined in the agreement.
>
> To prove a violation of Section 1347, which is healthcare fraud, the Government must prove:
>
> One, a scheme to defraud or a scheme to obtain money or property by means of material, false and fraudulent pretenses, representations or promises in connection with the delivery of or payment for healthcare benefits;
>
> Two, the defendant knowingly and willfully executed or attempted to execute that scheme with the intent to defraud; and
>
> Three, the target of the scheme was a healthcare benefit program.

(Plea Tr. 28-29). Nothing more is required. In fact, as the Government argues, its description tracked Judge Sand's Modern Federal Jury Instructions on both the elements of conspiracy (minus the overt act instruction, which is not required under Section 1349) and healthcare fraud. *See* Sand, Modern Federal Jury Instructions, Instr. 19-3, 44-14. And Petitioner confirmed he understood the nature of this charge, not only in response to Judge McCarthy's questions, but also through his own allocution and his stipulation that the fraudulent scheme targeted healthcare benefit programs. (Plea Tr. 4-14, 33-45.) Furthermore, Petitioner's claim he was "never informed that 'knowledge of the existence of the conspiracy; and the intent to participate in an unlawful enterprise' were elements of the offense" (Mot. at 8) is flat out contradicted by the elements the Government recited during the proceeding (*e.g.*, "that each defendant knowingly and intentionally joined in the agreement [to commit healthcare fraud]") (Plea Tr. 28).

Petitioner's citation to *Irizarry v. United States*, 508 F.2d 960 (2d Cir. 1974), is unhelpful. Nothing in *Irizarry* comes close to suggesting that a defendant must be "informed of [the elements of conspiracy], personally, by the judge." (Mot. at 7-8.) Indeed, as noted above, the Second Circuit held to the contrary in *Farooq*. 58 F.4th at 692. Instead, in *Irizarry*, the Second Circuit found Rule 11 deficiencies when "the full charge—conspiracy to possess and distribute cocaine—was never even identified" during the change-of-plea, and "[t]he closest that the court came was to identify the charge was 'conspiracy'; conspiracy to do what was never mentioned." 508 F.2d at 964. Nor was the defendant in *Irizarry* asked whether he understood the nature of the offense. *See id.* As explained above, those facts in no way compare with Judge McCarthy's careful and thorough Rule 11 colloquy with Petitioner.

Accordingly, the Court concludes that the record unequivocally demonstrates that Petitioner was clearly informed of, and fully understood, the nature of the conspiracy to commit healthcare fraud charge that he pleaded guilty to before Judge McCarthy. Therefore, Petitioner cannot credibly claim that his appellate counsel was ineffective for not pursuing on appeal an issue that was frivolous and contradicted by the record. Nor is a hearing necessary to elaborate on what is an indisputable record.

### 2. Factual Basis for the Plea – Rule 11(b)(3)

Equally meritless is Petitioner's claim that there was no factual basis for his guilty plea, as required by Rule 11(b)(3). The Second Circuit has explained that this rule requires the district court "to assure itself simply that the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty." *United States v. Lloyd*, 901 F.3d 111, 123 (2d Cir. 2018) (omitting internal quotation and citation). Contrary to Petitioner's suggestion, the Court "is not required to rely solely on the defendant's own admissions" in

making this determination, *Maher* 108 F.3d at 1524, but may instead rely on, among other things, "the defendant's own admissions, and to "statements of the defendant, of the attorneys from the government and the defense," *Loyd*, 901 F. 3d 123.

Here, Petitioner's own allocution included the admission that he and others caused the submission of healthcare claims to insurance companies that contained fraudulent information about the practices' ownership, and that he did so knowingly and intentionally. (Plea Tr. 43-45.) As part of that scheme, Petitioner admitted that he received money that he knew he was not entitled to, and that he knew his conduct was illegal. (*Id.* at 44.) And, as noted above, Petitioner stipulated that the targets of the scheme included healthcare benefit programs, including "Medicare and multiple other insurance providers." (*Id.* at 36-37.) The Government also provided a detailed explanation of the other evidence it would introduce at trial regarding the defendant and his role in the DAM healthcare fraud scheme. (*Id.* at 28-32.) Based on this fulsome record, Judge McCarthy had more than a sufficient information to find a factual basis for Petitioner's plea. While Petitioner now hopes to minimize his conduct by suggesting he violated only New York State law, his own admissions from his plea allocution show that he knowingly and willfully participated in a scheme to defraud healthcare benefit programs, including, as noted Medicare. (*Id.* at 36-37.)[5] Simply put, there is no way to interpret the clear

---

[5] During the allocution, the following exchange took place:

Q: I want to make sure the elements of the healthcare fraud have been met. So what was the healthcare benefit program that was the target of the fraud that you are pleading guilty to?
A: The healthcare insurance companies, your Honor.

A few lines down the following exchange took place:

Ms. Martin (AUSA): And I assume [defense counsel] would confirm that there's no dispute that they are health care benefit programs. It's Medicare and multiple other insurance providers.
Defense Counsel: We don't contest that, your Honor.
Judge McCarthy: Okay. And you, during this conspiracy, you receive property as a result of this, property and money, as a result of the scheme to defraud and you benefited from it, is that correct?

record to suggest that Petitioner thought he was admitting only to state law violations. Thus, there is no basis whatsoever to conclude that Petitioner's detailed plea allocution failed to provide a factual basis to accept his guilty plea. As such, Petitioner cannot claim his appellate counsel was ineffective for not raising it.

### III.  Conclusion

For the foregoing reasons, the Petition is dismissed with prejudice. The Clerk of Court is respectfully directed to terminate the instant Petition, enter judgment for Respondent in Case No. 23-CV-5885; close Case No. 23-CV-5885; and mail a copy of this Opinion to Petitioner Plaintiff at the address listed in the docket for Case No. 23-CV-5885. Furthermore, the Court finds that Petitioner has not made a substantial showing of a denial of a federal right, and that appellate review is therefore not warranted, *see Tankleff v. Senkowski*, 135 F.3d 235, 241 (2d Cir. 1998); and, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal taken from the order would not be in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962).

SO ORDERED.

Dated:    November 18, 2024
          White Plains, New York

_____
          KENNETH M. KARAS
          United States District Judge

---

Petitioner: Yes, your Honor.

21